# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>VICTOR RAMIREZ-GONZALEZ,<br><br>Defendant. | Case No. 5:14-cr-00407-BLF-1<br><br>**ORDER DENYING MOTION TO DISMISS INDICTMENT**<br><br>[Re: ECF 28] |

Defendant Victor Ramirez-Gonzalez is charged with one count of violating 8 U.S.C. § 1326, which prohibits illegally re-entering the United States after being deported. *See* Superseding Indictment, ECF 22. Ramirez-Gonzalez argues that his prior deportation was unlawful and that the United States cannot establish the deportation element of the Section 1326 offense. *See* Mot. at 1, ECF 28. He thus moves to dismiss the superseding indictment. *See id.* Because Ramirez-Gonzalez has not shown that he was prejudiced by due process violations in his 2008 deportation proceedings, his motion is DENIED.

## I.   BACKGROUND

Ramirez-Gonzalez is a native and citizen of Mexico. *See* Record of Deportable/Inadmissible Alien, Feb. 13, 2007, Def.'s Ex. D, ECF 28-1. He came to the United States in April of 2000 or 2002[1] and was deported on Nov. 5, 2008. *See* Warrant of Removal/Deportation, Def.'s Ex. K, ECF 28-1. While living in the United States, he had several encounters with the law. The relevant portions of his criminal and immigration history are summarized here.

---

[1] Ramirez-Gonzalez states that he came to the United States in April 2000, *see* Ramirez-Gonzalez Decl. ¶ 1, Def.'s Ex. I, ECF 28-1. Immigrations and Customs Enforcement ("ICE") lists his date of entry as April 2002, *see* Record of Deportable/Inadmissible Alien, Feb. 11, 2008, Def.'s Ex. E at 2, ECF 28-1.

**A. Felony Pen. C. § 244 Conviction**

On Mar. 21, 2005, Ramirez-Gonzalez was charged in Monterey County Superior Court with four felony counts: two counts of violating Cal. Penal C. § 244 ("Pen. C. § 244"), assault with caustic chemicals; one count of violating Pen. C. § 422, threats of violence; and one count of Pen. C. § 273.5(a), corporal injury to spouse/cohabitant/parent of child. *See* Information, Def.'s Ex. A at 1-3, ECF 28-1. Count one of the Information alleged that

> On or about MARCH 3, 2004 the crime of ASSAULT WITH CAUSTIC CHEMICALS, in violation of Section 244 of the Penal Code, a FELONY, was committed by VICTOR GONZALEZ, who at the time and place last aforesaid, did willfully, unlawfully, and maliciously place and throw, and cause to be placed and thrown upon the person of [ECC], vitriol, corrosive acid and caustic chemical with the intent to injure the flesh and disfigure the body of said victim.

*Id.* at 1. According to the probation officer's report, Ramirez-Gonzalez had thrown hydrochloric acid on his girlfriend, who was trying to leave him, and her sister. *See* Probation Officer's Report, Pl.'s Ex. C at 2-3, ECF 31-1.

Ramirez-Gonzalez ultimately pled to the first count, assault with caustic chemical, *see* Minute Order, May 5, 2005, Def.'s Ex. B, ECF 28-1, and the other counts were dismissed. *See* Minute Order, June 2, 2005, Pl.'s Ex. E, ECF 31-1. Although the Superior Court's minute order states that Ramirez-Gonzalez stipulated to a factual basis for the plea, the factual basis is not provided. *See* Minute Order, May 5, 2005, Def.'s Ex. B. The Superior Court sentenced Ramirez-Gonzalez to three years' probation and 365 days in jail, which was suspended while he was on probation. *See* Minute Order, June 2, 2005, Pl.'s Ex. E.

**B. 2005 Misdemeanor Driving Conviction**

On Apr. 15, 2005, while his felony case was proceeding, Ramirez-Gonzalez also was convicted of the misdemeanor offense of driving without a license, and was sentenced to ten days' confinement. *See* Compl. at 2, ECF 1; Cal. Veh. Code § 12500.

The United States argues that Ramirez-Gonzalez "apparently sustained another conviction" for driving without a license on June 29, 2005, but in the absence of a judgment or other record of this conviction, the Court will not consider this conviction. Opp. at 2, ECF 31.

2

### C. 2006 Immigration Encounter

In December 2006, Ramirez-Gonzalez came to the attention of ICE due to his Pen. C. § 244 conviction. *See* Record of Deportable/Inadmissible Alien, Feb. 13, 2007, Def.'s Ex. D at 1, ECF 28-1. At that time ICE described his Pen. C. § 244 conviction as an "aggravated felony" under 8 U.S.C. § 1101(a)(43)(F). *See id.* at 2. ICE's Record of Deportable/Inadmissible Alien states that Ramirez-Gonzalez was scheduled to be arrested at the Monterey County Probation office on Feb. 14, 2007, but nothing appears to have come of this. *See id.*

### D. 2008 Domestic Violence Arrest and Deportation

Just over a year later, the Seaside Police Department arrested Ramirez-Gonzalez in connection with a domestic violence incident. *See* Incident/Arrest Report, Feb. 10, 2008, Pl.'s Ex. F at 8, ECF 31-1. According to the police report, Ramirez-Gonzalez and his wife had argued and she had thrown a glass cup at him. *See id.* She missed and the cup shattered on the ground. *See id.* Ramirez-Gonzalez then slashed his wife to the bone with the broken glass: the cut was about four inches long and one inch wide, and it "was deep and the Victim's bone was showing." *Id.* at 4. He also slashed her finger, which had a smaller, bleeding cut. *See id.* This arrest triggered ICE's attention, and from this point, Ramirez-Gonzalez had both criminal and immigration proceedings pending.

On Feb. 12, 2008, an ICE officer interviewed Ramirez-Gonzalez, and Ramirez-Gonzalez stated that he did not want to fight the immigration proceedings. *See* Record of Deportable/Inadmissible Alien, Feb. 11-12, 2008, Def.'s Ex. E at 1, ECF 28-1. Ramirez-Gonzalez states that he does not remember this interview. *See* Ramirez-Gonzalez Decl. ¶ 2, Pl.'s Ex. I.

In September 2008, Ramirez-Gonzalez was charged with multiple felony counts, including violating Cal. Penal C. § 273.5(a), inflicting corporal injury on spouse/cohabitant/parent of child, and Cal. Penal C. § 245(a)(1), assault with a deadly weapon or with force likely to produce great bodily injury. *See* Information, Pl.'s Ex. G, ECF 31-1. A petition to revoke his probation for the Pen. C. § 244 conviction was filed, but it was later withdrawn and probation was reinstated. *See* Minute Order, Nov. 3, 2008, Def.'s Ex. F, ECF 28-1. The charges were ultimately dismissed on Nov. 3, 2008. *See* Minute Order, Nov. 3, 2008, Pl.'s Ex. H, ECF 31-2.

3

On Nov. 5, 2008, ICE served Ramirez-Gonzalez a Notice of Intent to Issue a Final Administrative Removal Order. *See* Notice of Intent to Issue a Final Administrative Removal Order ("Notice of Intent"), Def.'s Ex. H at 1, ECF 28-1. The Notice of Intent stated that Ramirez-Gonzalez was "deportable under . . . 8 U.S.C. 1227(a)(2)(A)(iii) . . . because [he had] been convicted of an aggravated felony as defined in . . . 8 U.S.C. 1101(a)(43)(F)." *Id.* The aggravated felony conviction referred to his Pen. C. § 244 conviction. *See id.* at 3. The Notice of Intent also stated that Ramirez-Gonzalez could be represented by counsel and had to respond to the charges in the Notice of Intent within 10 calendar days of service. *See id.* at 1. It further stated that he could request an extension of time, rebut the charges against him, request an opportunity to review the government's evidence, admit deportability, designate a county for removal, or request withholding of removal under 8 U.S.C § 1231(b)(3) or the Convention Against Torture. *See id.* Finally, the Notice of Intent indicated that he had the right to remain in the United States for 14 calendar days in order to file a petition for review with the appropriate U.S. Circuit Court of Appeals. *See id.*

ICE agent Joshua Arambulo served the Notice of Intent on Ramirez-Gonzalez at 3:30 p.m. on Nov. 5, 2008. *See id.* at 2. Arambulo indicated that he "explained and/or served this Notice of Intent" to Ramirez-Gonzalez in Spanish. *Id.*

Five minutes later, at 3:35 p.m., Ramirez-Gonzalez signed the Notice of Intent and checked boxes indicating that he admitted the allegations and charges in the Notice of Intent, acknowledged that he was "not eligible for any form of relief from removal," "waive[d] [his] right to rebut and contest" the charges against him, and "[did] not wish to request withholding or deferral of removal." *Id.* He also indicated that although he understood that he had the right to remain in the United States for 14 calendar days in order to apply for judicial review, he "[did] not wish this opportunity" and "waive[d] this right." *Id.* A Final Administrative Removal Order was issued the same day, finding that Ramirez-Gonzalez had "a final conviction for an aggravated felony as defined in . . . 8 U.S.C. 1101(a)(43)(F)," was "ineligible for any relief from removal that the Security of Homeland Security, may grant in an exercise of discretion," and was "deportable as an alien convicted of an aggravated felony pursuant to . . . 8 U.S.C. 1227(a0(2)(A)(iii)." Final

Administrative Removal Order, Def.'s Ex. J, ECF 28-1.  A Warrant of Removal/Deportation was issued and Ramirez-Gonzalez was deported.  *See* Warrant of Removal/Deportation at 1-2, Def.'s Ex. K, ECF 28-1.

Ramirez-Gonzalez now declares that Arambulo neither gave him copies of his immigration documents nor explained them to him.  *See* Ramirez-Gonzalez Decl. ¶¶ 5, 8.  Arambulo showed Ramirez-Gonzalez only the second page of the Notice of Intent and showed him where to sign it—but did not translate or explain it to him in Spanish.  *See id.* at ¶ 7.  Ramirez-Gonzalez does not read or speak English, however, and understands only "a little bit" of English.  *See id.*  Anything complicated "has to be explained to [him] in Spanish."  *Id.* at ¶ 4.  Ramirez-Gonzalez states that the immigration officer that spoke to him was not fluent in Spanish, and spoke to him in a mix of English and Spanish.  *See id.*

Ramirez-Gonzalez further states that the ICE agent failed to inform him that a judge could tell him about avoiding deportation, and did not explain voluntary departure to him.  *See id.* at ¶ 6.  Ramirez-Gonzalez states that no one informed him that he was eligible for voluntary departure or any other relief from deportation.  *See id.*  According to Ramirez-Gonzalez, Arambulo told him that if he wanted to see a judge, then he would be transported to Arizona and get "mas [sic] carcel," or more time in jail.  *Id.* at ¶ 5.  Ramirez-Gonzalez also was not informed that he had a right to a lawyer or that he could contest the immigration charges.  *See id.* at ¶ 8.  He states that if he had been properly informed of his rights, then he would have refused to sign the Notice of Intent, hired an immigration lawyer, and requested to see a judge and ask for voluntary departure.  *See id.* at ¶¶ 6, 8-9.

### E.  Current Indictment

Ramirez-Gonzalez reentered the United States sometime after being deported, and is now charged with one count of violating 8 U.S.C. §§ 1326(a), (b) by illegally reentering this country without the permission of the Attorney General or the Secretary of Homeland Security.  *See* Superseding Indictment at 2-3, ECF 22.  He moves to dismiss this charge on the ground that his prior deportation order was unlawful and cannot be the predicate for the Section 1326 charge of illegal reentry.  *See* Mot.

## II.  LEGAL STANDARD

"For a defendant to be convicted of illegal reentry under 8 U.S.C. § 1326, the Government must establish that the defendant left the United States under order of exclusion, deportation, or removal, and then illegally reentered." *United States v. Raya-Vaca*, 771 F.3d 1195, 1201 (9th Cir. 2014) (internal quotation marks and citation omitted).  "A defendant charged under § 1326 has a due process right to collaterally attack his removal order because the removal order serves as a predicate element of his conviction." *Id*. (internal quotation marks and citation omitted).

8 U.S.C. § 1326(d) sets forth three requirements for collaterally attacking the underlying deportation order in a Section 1326 case.  The defendant must show that he or she (1) exhausted administrative remedies; (2) was deprived of the opportunity for judicial review, and (3) the entry of the order was fundamentally unfair.  *See Raya-Vaca*, 771 F.3d at 1201 (citing 8 U.S.C. § 1326(d)).  A defendants can establish the first two requirements by showing that he or she was denied judicial review of the removal proceedings in violation of due process, or by "showing that immigration officials in the underlying removal proceeding violated a regulation designed to protect an alien's right to judicial review." *United States v. Gomez*, 757 F.3d 885, 892 (9th Cir. 2014).  To satisfy the third requirement, the defendant bears the burden of establishing both that the deportation process violated his or her due process rights and that the violation caused prejudice.  *See Raya-Vaca*, 771 F.3d at 1201-02.

## III.  DISCUSSION

The current Section 1326 prosecution is based on Ramirez-Gonzalez's 2008 deportation order, which in turn was based on his Pen. C. § 244 conviction.  Ramirez-Gonzalez argues that the first two Section 1326(d) requirements are satisfied because in the 2008 proceedings, ICE officials failed to advise him that he was eligible for relief from deportation.  *See* Mot. at 16-25.  He argues that the third Section 1326(d) requirement is satisfied because he was eligible for pre-hearing voluntary departure in lieu of deportation, and it is plausible that he would have received it.  *See id*. at 23-25.  The United States contests only the third Section 1326(d) requirement and argues that Ramirez-Gonzalez was ineligible for voluntary departure due to his Pen. C. § 244 conviction, and that it is implausible that he would have received voluntary departure given his criminal

6

history and personal background. *See* Opp. at 6-22.

The Court finds that the first two requirements of Section 1326(d) are satisfied, but that the third is not, because it is implausible that Ramirez-Gonzalez would have received pre-hearing voluntary departure in 2008.

### A. Validity of Waiver of Appeal

When Ramirez-Gonzalez signed the Notice of Intent, he also waived his right to contest the deportation charges and his right to remain in the United States to apply for judicial review. *See* Notice of Intent, Pl.'s Ex. H at 2. The United States does not argue that the waiver is valid or that it bars this collateral attack on the removal order, but the Court addresses the matter as a threshold issue. *See United States v. Ramos*, 623 F.3d 672, 680 (9th Cir. 2010) ("[A]n alien cannot collaterally attack an underlying deportation order if he validly waived the right to appeal that order.").

A valid waiver of the right to appeal must be "considered and intelligent," and the "government bears the burden of proving valid waiver in a collateral attack of the underlying removal proceedings." *Id.* (internal citations omitted). *United States v. Ramos* addressed a situation similar to Ramirez-Gonzalez's, where the defendant "signed away his right to appeal, to appear before an IJ, and to be represented by counsel in an individual meeting with a deportation officer who testified that she [was] not fluent in Spanish." 623 F.3d at 681. The Ninth Circuit held that a waiver of the right to appeal is not considered or intelligent if the defendant "did not receive a competent Spanish language translation of his right to appeal when he signed the form." *Id.*

Ramirez-Gonzalez states that the ICE agent that met with him on Nov. 5, 2008, when he signed the Notice of Intent and waived his appeal rights, was not fluent in Spanish and that Ramirez-Gonzalez "did not understand everything he said." Ramirez-Gonzalez Decl. ¶ 4. The agent did not translate, explain, or review the Notice of Intent with Ramirez-Gonzalez before telling him where to sign. *Id.* ¶¶ 5, 7. The United States has not presented a declaration from the ICE agent to contradict Ramirez-Gonzalez's account of the Nov. 5, 2008 encounter or show that he received a competent Spanish translation of his right to appeal. Because the United States has

not met its burden of proving that Ramirez-Gonzalez's waiver was considered and intelligent, the Court finds that the waiver is invalid and does not block this collateral attack.

### B. Section 1326(d)(1) and (2)

Moving on to the Section 1326(d) inquiry, the Court finds that Ramirez-Gonzalez has satisfied the first two Section 1326(d) requirements by showing that immigration officials in his 2008 removal proceedings failed to inform him that he was eligible for discretionary relief, specifically pre-hearing voluntary departure. The United States does not contest Ramirez-Gonzalez's arguments that he is excused from administrative exhaustion or that he was denied the opportunity for judicial review.

The first Section 1326(d) requirement is administrative exhaustion. *See* 8 U.S.C. § 1326(d)(1). A defendant is "exempted from the exhaustion requirement in 8 U.S.C. § 1326(d)(1)" if an immigration judge fails to inform him that he was eligible for relief from deportation. *United States v. Ubaldo-Figueroa*, 364 F.3d 1042, 1049 (9th Cir. 2004). Per 8 U.S.C. § 1228(b), which allows for expedited removal of aliens convicted of aggravated felonies, Ramirez-Gonzalez was never taken before an immigration judge; instead, an ICE agent served the Notice of Intent on him. *See* Notice of Intent, Pl.'s Ex. H at 1-2 ("the Department is serving upon you this NOTICE OF INTENT . . . without a hearing before an Immigration Judge); Ramirez-Gonzalez Decl. ¶¶ 3-6. Neither the ICE agent nor anyone else, however, informed Ramirez-Gonzalez that he was eligible for voluntary departure or any other deportation relief. *See* Ramirez-Gonzalez Decl. ¶ 6.

The second Section 1326(d) requirement is deprivation of the opportunity for judicial review. *See* 8 U.S.C. § 1326(d)(2). A failure to advise an alien of the right to apply for relief from deportation deprives him of judicial review, "because an alien who is not made aware that he has a right to seek relief necessarily has no meaningful opportunity to appeal the fact that he was not advised of that right." *United States v. Arrieta*, 224 F.3d 1076, 1079 (9th Cir. 2000). In *Ramos*, the Ninth Circuit held that Ramos' procedurally defective waiver of his right to appeal his removal order deprived him of the opportunity for meaningful judicial review. *See Ramos*, 623 F.3d at 682. As in *Arrieta*, Ramirez-Gonzalez was not informed that he had the right to seek relief—the closest thing in the record is the ICE agent's statement, "Juez Mas [sic] tiempo carcel." Ramirez-

8

Gonzalez Decl. ¶ 5. But the phrase "Judge more time jail" is hardly an explanation that Ramirez-Gonzalez had the right to appear before a judge to contest his removal order; it is hardly an intelligible sentence. As in *Ramos*, Ramirez-Gonzalez's waiver of his right to appeal was procedurally defective and invalid. Ramirez-Gonzalez thus was deprived of the opportunity for judicial review.

### C. Section 1326(d)(3)

The third Section 1326(d) requirement has two parts: Ramirez-Gonzalez must first show that the deportation process violated his due process rights, and second, that the violation prejudiced him. *See Raya-Vaca*, 771 F.3d at 1201-02. The Court finds that Ramirez-Gonzalez has satisfied the first part of the Section 1326(d)(3) requirement but not the second.

#### 1. Due Process Violation

In this case, it is simple to show a violation of due process: Failure to inform an alien of his or her apparent eligibility for relief from removal is a "denial of due process that invalidates the underlying deportation proceeding." *Ubaldo-Figueroa*, 364 F.3d at 1050. As previously discussed, Ramirez-Gonzalez was never informed that he was eligible for pre-hearing voluntary departure. *See supra* at 5. Q.E.D.

#### 2. Prejudice

It is more difficult, however, to show prejudice. ICE's failure to advise Ramirez-Gonzalez of his apparent eligibility for pre-hearing voluntary departure prejudiced him only if it is plausible that he would have obtained that relief. *See United States v. Valdez-Novoa*, 780 F.3d 906, 914 (9th Cir.), *cert. denied*, 135 S. Ct. 2913 (2015). It is the defendant's burden to "make the initial showing that he was prejudiced by the alleged due process violation." *Id.* at 916.

There are two separate issues: whether Ramirez-Gonzalez was eligible for pre-hearing voluntary departure at all, and if eligible, whether it is plausible he would have received it. The United States argues that Ramirez-Gonzalez was ineligible for pre-hearing voluntary departure, because he had been convicted of an aggravated felony and aliens with prior aggravated felony convictions are ineligible for pre-hearing voluntary departure. *See* Opp. at 7-16; 8 U.S.C. § 1229c(a)(1). The United States further argues that it is implausible that Ramirez-Gonzalez would

have received voluntary departure given his criminal history and personal background. *See* Opp. at 16-23. Ramirez-Gonzalez argues that his Pen. C. § 244 conviction was not an aggravated felony that barred him from pre-hearing voluntary departure, and that the equities of his situation in 2008 make it plausible that he would have received pre-hearing voluntary departure if he had requested it. *See* Mot. at 7-25. The Court finds that a conviction under Pen. C. § 244 is not an aggravated felony that would have made Ramirez-Gonzalez ineligible for pre-hearing voluntary departure.[2] The Court also finds, however, that given Ramirez-Gonzalez's criminal history and personal background, it is implausible that he would have received pre-hearing voluntary departure.

### a. Eligibility for Pre-Hearing Voluntary Departure

8 U.S.C. § 1229c(a) allows the Attorney General to "permit an alien voluntarily to depart the United States at the alien's own expense" instead of being deported. Pre-hearing voluntary departure is not available to aliens with prior aggravated felony convictions, however. *See* 8 U.S.C. § 1229c(a)(1). Ramirez-Gonzalez's removal order thus states that he was ineligible for any relief from removal due to his conviction for an aggravated felony, as defined in 8 U.SC. § 1101(a)(43)(F). *See* Final Administrative Removal Order, Def.'s Ex. J. 8 U.SC. § 1101(a)(43)(F) defines an "aggravated felony" as a "crime of violence," as defined in 18 U.SC. § 16, for which the term of imprisonment is at least one year. 18 U.S.C. § 16(a) in turn defines a "crime of violence" as "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another." Ramirez-Gonzalez argues that his Pen.

---

[2] Similar to Judge Watford's comments in his concurring opinion in *U.S. v. Parnell*, 818 F.3d 974, 982 (9th Cir. 2016), this Court's initial impression of Cal. Penal C. § 244 was that it easily qualified as a crime of violence under 18 U.S.C. § 16(a). Upon a superficial reading of the state statute, which invokes horrible injury and disfigurement along with malicious intent, it seemed clearly within the ambit of Section 16(a). However, upon more careful review, the Court recognizes that the analysis must focus on the elements of the crime and the least culpable conduct criminalized under the statute. *Moncrieffe v. Holder*, 133 S. Ct. 1678, 1684 (2013) (in the categorical analysis, the Court must presume that a conviction rested on the least of the acts criminalized by the statute). As discussed in depth below, a fair reading of the statute and consideration of the California Supreme Court's long-standing interpretation of its scope persuades the Court that what initially seemed absurd is in fact the required result.

10

C. § 244 conviction does not meet 18 U.S.C. § 16(a)'s definition of a crime of violence; the United States argues that it does. *See* Mot. at 7-16; Opp. at 7-16.

To determine whether a state conviction qualifies as a Section 16(a) crime of violence, the Court applies the three-part categorical match test. *See Descamps v. United States*, 133 S. Ct. 2276, 2281; *Lopez-Valencia v. Lynch*, 798 F.3d 863, 867 (9th Cir. 2015) (summarizing the *Descamps* test). First, the Court compares the elements of the state statute of conviction—here, Pen. C. § 244—to the elements of the generic federal offense—here, 18 U.S.C. § 16(a). *See Lopez-Valencia*, 798 F.3d at 867. If the elements of the state statute are the same as or narrower than the elements of the federal statute (i.e., the state statute contains every element of the generic offense), then there is a categorical match between the statutes, the statute of conviction is an aggravated felony, and the Court's inquiry ends. *See id*. Second, if the state statute is broader than the generic federal offense and criminalizes conduct that goes beyond the elements of the federal statute, the Court determines whether the state statute is divisible or indivisible. *Id*. at 867-88. A statute is indivisible when it sets out a "single . . . set of elements to define a single crime." *Mathis v. U.S.*, 579 U.S. __, 2016 WL 3434400, at *4 (2016).

A statute is divisible if it lists elements in the alternative and thereby defines multiple crimes. *See id*. If the state statute is indivisible, the inquiry ends, because "conviction under an indivisible, overbroad statute can *never* serve as a predicate offense." *Lopez-Valencia*, 798 F.3d at 868 (internal quotation marks and citation omitted). Third, if the state statute is divisible, the Court applies the modified categorical approach and examines "certain documents from the defendant's record of conviction to determine what elements of the divisible statute he was convicted of violating." *Id.*

### i. Categorical Match

The first step is to identify the elements of 18 U.S.C. § 16(a) and Pen. C. § 244 and compare them to see if the statutes are a categorical match. When considering whether the state offense is broader than the federal offense, the Court looks at whether there is a "realistic probability" that the state will apply its statute to conduct falling outside the generic definition of a crime. *Gonzales v. Duenas–Alvarez*, 549 U.S. 183, 193 (2007). One way to show the "realistic

11

probability" is to provide examples of actual cases where state courts "did apply the statute in the special (nongeneric) manner." *Id.* Another way is to look at the text of the statute. If "a state statute explicitly defines a crime more broadly than the generic definition, no 'legal imagination' is required to hold that a realistic probability exists that the state will apply its statute to conduct that falls outside the generic definition of the crime." *United States v. Grisel*, 488 F.3d 844, 850 (9th Cir. 2007) (en banc) (citation omitted). When a "state statute's greater breadth is evident from its text," a petitioner need not point to an actual case applying the statute of conviction in a nongeneric manner. *Grisel*, 488 F.3d at 850.

Pen. C. § 244 states that

> Any person who willfully and maliciously places or throws, or causes to be placed or thrown, upon the person of another, any vitriol, corrosive acid, flammable substance, or caustic chemical of any nature, with the intent to injure the flesh or disfigure the body of that person, is punishable by imprisonment in the state prison for two, three or four years.

The elements of Pen. C. § 244 thus are (1) willfully and maliciously placing, throwing, or causing to be placed or thrown any vitriol, corrosive acid, flammable substance, or caustic chemical of any nature on another person and (2) doing so with the intent to injure that person's flesh or disfigure her or his body.

18 U.S.C. § 16(a)'s element is the "use, attempted use, or threatened use of physical force against the person or property of another." This element has two aspects. The first is a mens rea incorporating a degree of intent greater than negligence. *See Leocal v. Ashcroft*, 543 U.S. 1, 9-11 (2004) (holding that Section 16(a)'s "use . . . of physical force" element cannot be satisfied by negligent or accidental conduct); *see also Voisine v. United States*, 579 U.S. __, 2016 WL 3461559 (2016) (holding that 18 U.SC. § 922(g)(9)'s "use . . . of physical force" element includes reckless conduct). The second is that "use . . . of physical force" means "violent force" or "force capable of causing physical pain or injury to another person." *Rodriguez-Castellon v. Holder*, 733 F.3d 847, 854 (9th Cir. 2013).

The Court holds that Pen. C. § 244 and Section 16(a) are not a categorical match because Pen. C. § 244 is broader than Section 16(a) and there is a realistic probability that California will apply Pen. C. § 244 to conduct falling outside Section 16(a). While Section 16(a)'s "use . . . of

1  force" element requires the use of "violent force" or "force capable of causing physical pain or
2  injury to another person," Pen. C. § 244 encompasses conduct that is not violent and is not capable
3  of causing pain or injury to another person. This is evident from both the text of the statute and
4  judicial interpretations of it. The statute criminalizes throwing "*any* vitriol, corrosive acid,
5  flammable substance, or caustic chemical of *any nature*." Pen. C. § 244 (emphasis added). On its
6  face, "of any nature" encompasses even extremely diluted "vitriol, corrosive acid, flammable
7  substance, or caustic chemical" incapable of causing injury; the statute does not require that the
8  vitriol, corrosive acid, flammable substance, or caustic chemical be capable of injuring the victim.
9  Pen. C. § 244 focuses on the willful and malicious intent to injure or disfigure rather than the
10 actual harmfulness of the acid. The California Supreme Court construed Pen. C. § 244 to mean
11 just that in *People v. Day*, which held that

> [t]he crime is complete if any quantity of acid so described, however small in quantity or *however weak in strength and however incapable of producing great bodily harm*, is thrown or placed upon the person of another, if done wilfully and maliciously with the intent to injure the flesh or to disfigure to the slightest extent the body of another.

199 Cal. 78, 86 (1926) (emphasis added). Pen. C. § 244's breadth thus is evident from its text, satisfying the "realistic probability" requirement. As further support Ramirez-Gonzalez has identified one case where a defendant was charged with violating Pen. C. § 244 for throwing paint with the intent to injure and disfigure. *See In re D.R.*, Case No. A119800, 2008 WL 2109841 (Cal. Ct. App. May 20, 2008). At oral argument, the United States argued that *In re D.R.* is unpublished and cannot be cited, but the Ninth Circuit allows the use of unpublished decisions when evaluating whether a state statute has been applied to conduct falling outside the generic federal offense. *See Vizcarra-Ayala v. Mukasey*, 514 F.3d 870, 876 n.3 (9th Cir. 2008).

The United States makes four arguments that Pen. C. § 244 is not overbroad: first, the act of purposefully throwing acid on the victim with the intent to injure or disfigure is a use of physical force. *See* Opp. at 11. Second, Section 16(a) does not require actual injury to the victim. *See id.* at 12. Third, if the substance thrown is not a substance prohibited by Pen. C. § 244, then there is no Pen. C. § 244 violation, and if the defendant is mistaken about the strength of the acid, then he or she has still attempted to use force against the victim. *See id.* at 13-14. Fourth,

Ramirez-Gonzalez has not proven a realistic probability that California will apply Pen. C. § 244 to conduct falling outside the generic definition of a crime of violence. *See id.* at 14. None of these arguments is availing.

The United States' first argument focuses on Pen. C. § 244's intent requirement to satisfy the use of force element. The United States appears to believe that the problem with Pen. C. § 244 is that it criminalizes minimal or indirect physical touching, movement, or action, and so argues that it is the knowing throwing of acid *with the intent to injure or disfigure* that makes this conduct a use of physical force. *See* Opp. at 11. The United States cites *United States v. Castleman*, which held that "employing poison knowingly as a device to cause physical harm" is a use of physical force even though it may involve minimal physical acts, and argues that using acid is analogous. *See* 134 S. Ct. 1405, 1415 (2014); Opp. at 11. But what makes Pen. C. § 244 broader than Section 16(a) is not that Pen. C. § 244 criminalizes conduct where a defendant has minimal or indirect physical contact with the victim, or makes only a minimal physical movement when throwing acid on her or him. The problem is that Pen. C. § 244 criminalizes conduct such as throwing acid so dilute that it is incapable of causing injury, so long as the defendant does so with the intention of injuring or disfiguring the victim. And the "use . . . of physical force" requires "violent force" or "force capable of causing physical pain or injury to another person." *Rodriguez-Castellon v. Holder*, 733 F.3d 847, 854 (9th Cir. 2013).

The United States' second argument is that Section 16(a) does not require actual injury to qualify an act as a crime of violence, as shown by Section 16(a)'s inclusion of both "attempted" and "threatened" uses of physical force. *See* Opp. at 12; 18 U.S.C. § 16(a). But as discussed above, Pen. C. § 244 encompasses throwing the prohibited substances even if they are dilute to the point of harmlessness. This means that an attempted or threatened use of such substances still does not qualify as an attempted or threatened use of physical force; if physical force requires "violent force" or "force capable of causing physical pain or injury to another person," then an attempted or threatened use of physical force requires attempted or threatened use of violent force or force capable of causing physical pain or injury to another person. Moreover, neither an attempted nor a threatened use of force is an element of Pen. C. § 244. When a defendant throws diluted, harmless

acid on a victim, and does so with the intent to injure or disfigure, that is a completed Pen. C. § 244 offense, not an attempted one. *See Day*, 199 Cal. at 85-86. Only the completed act is punishable under Pen. C. § 244. *See* CALCRIM 877, Commentary, Pl.'s Ex. L, ECF 28-1 (stating that "actual contact" with the victim is required).

The United States' third argument is that if the substance thrown is not a prohibited one, there is no Pen. C. § 244 violation. *See* Opp. at 12. The United States adds that if a Pen. C. § 244 defendant is mistaken about the strength of the substance, he or she has still attempted or threatened to use force because the acid must be thrown with the intent to disfigure or injure. *See id.* at 12-13. The Court agrees that if the defendant throws a substance that is not prohibited, then there is no Pen. C. § 244 violation. But Pen. C. § 244 prohibits throwing "*any* vitriol, corrosive acid, flammable substance, or caustic chemical of *any nature*," and so a vitriol, corrosive acid, flammable substance, or caustic chemical that is so dilute that it is incapable of causing injury is nonetheless a prohibited substance. Pen. C. § 244 (emphasis added). Neither the United States nor the Court has been able to identify a legal requirement that the substance be capable of causing harm. The argument on attempted or threatened use of force has been addressed in the preceding paragraph.

The United States' fourth argument is that Ramirez-Gonzalez must prove there is a realistic probability that California will apply Pen. C. § 244 to conduct falling outside the generic definition of a crime of violence. *See* Opp. at 14. This argument has been addressed above. *See supra* at 12-13.

### ii. Divisibility

The next step is to determine whether Pen. C. § 244 is divisible or indivisible. A statute is indivisible when it sets out a "single . . . set of elements to define a single crime." *Mathis v. U.S.*, 579 U.S. __, 2016 WL 3434400, at *4 (2016). A statute is divisible if it lists elements in the alternative and thereby defines multiple crimes. *See id.* If the state statute is indivisible, the inquiry ends, because "conviction under an indivisible, overbroad statute can *never* serve as a predicate offense." *Lopez-Valencia*, 798 F.3d at 868 (internal quotation marks and citation omitted).

Pen. C. § 244 lists elements in the alternative, such that it defines multiple crimes. For example, Pen. C. § 244 can be satisfied by placing, throwing, or causing to be placed or thrown the substance; the substance can be a vitriol, corrosive acid, flammable substance, or caustic chemical of any nature; and the intent can be either to injure the flesh or disfigure the body of the victim. *See* Pen. C. § 244. The statute is indivisible as to the element that makes it broader than Section 16(a), however, which is the concentration of the substance. Pen. C. § 244 does not set forth the substance's concentration or its ability to harm, either in the singular or in the alternative. Pen. C. § 244 thus is both overbroad and indivisible as to the use of force element. The Court thus does not proceed to a step three modified categorical match analysis,[3] and finds that Pen. C. § 244 is not a categorical match for 18 U.S.C. § 16(a)'s crime of violence. Ramirez-Gonzalez's Pen. C. § 244 conviction thus is not an aggravated felony crime of violence that would have made him ineligible for pre-hearing voluntary departure.

### b. Plausibility that Pre-Hearing Voluntary Departure Would Have Been Granted

Since Ramirez-Gonzalez was eligible for pre-hearing voluntary departure in Nov. 2008, the next question is whether it is plausible that he would have received it. The Court finds that it is not.

Showing plausibility requires more than showing that it is "merely conceivable or possible, that an IJ would have granted the relief." *Valdez-Novoa*, 780 F.3d at 914. The Ninth Circuit "expressly reject[s] the contention that relief is 'plausible' whenever an IJ could have granted the relief at issue without abusing his discretion." *Id.* The factors relevant to an IJ's decision to grant voluntary departure are the alien's negative and positive equities. *See Matter of Gamboa*, 14 I. & N. Dec. 244, 248 (BIA 1972). The negative equities include "the nature and underlying circumstances of the deportation ground at issue; additional violations of the immigration laws; the existence, seriousness, and recency of any criminal record; and other evidence of bad character or the undesirability of the applicant as a permanent resident." *Matter of Arguelles–Campos*, 22 I.

---

[3] The United States did not argue that Section 244 was divisible.

& N. Dec. 811, 817 (BIA 1999). The positive equities "are compensating elements such as long residence here, close family ties in the United States, or humanitarian needs." *Id*.

Ramirez-Gonzalez makes several arguments: he had no immigration priors aside from his entry without inspection; he had lived in the United States for eight years; his two citizen children raised issues of family ties and humanitarian concerns; he had employment, which showed community ties; his criminal history was only one misdemeanor and one felony conviction, and he had served probation without incident for more than two years until he was arrested in February 2008 on domestic violence charges, which were dismissed before he was taken into ICE custody; and several negative factors, such as gang membership, substance abuse, having served a prison term, and having probation violations, were not present. *See* Mot. at 23-24; Reply at 12. He points to *Raya-Vaca*, which held that Raya-Vaca had shown plausibility even though only humanitarian considerations counseled in favor of relief, while the other factors did not. *See* 771 F.3d at 1208; Reply at 9. He also argues that pre-hearing voluntary departure is easier to obtain than post-hearing voluntary departure, and that the plausibility standard is low. *See* Reply at 8, ECF 32.

The United States challenges Ramirez-Gonzalez's characterization of the equities and also argues that an immigration judge would have been able to consider Ramirez-Gonzalez's 2008 domestic violence arrest, even though the charges were dismissed. *See* Opp. at 17-21. Ramirez-Gonzalez argues that an immigration judge could not have considered the arrest and cites out-of-Circuit cases, as well as *In Re Arreguin De Rodriguez*, a precedential Board of Immigration Appeals ("BIA") case. *See* 21 I. & N. Dec. 38, 42 (BIA 1995); Reply at 10-11.

Taking the equities in order, Ramirez-Gonzalez's removal order was based on his Pen. C. § 244 conviction, but the Court has found that this conviction cannot be an aggravated felony crime of violence. As for additional violations of immigration law, as of November 2008, Ramirez-Gonzalez had entered the United States without inspection. *See* Notice of Intent, Def.'s Ex. H at 1. He offers no precedent holding that entry without inspection is a positive rather than a negative equity. Ramirez-Gonzalez also had a criminal record consisting of a felony conviction for throwing hydrochloric acid on his girlfriend, a misdemeanor conviction for driving without a

17

license, and an arrest for domestic violence. *See* Compl. at 2, ECF 1; Incident/Arrest Report, Feb. 10, 2008, Pl.'s Ex. F at 8, ECF 31-1. This criminal history may not be as severe as others', but it still contained a serious felony and an arrest on serious charges. Make no mistake: while the Court has found that Pen. C. § 244 is not a crime of violence under Section 16(a), that is strictly because Pen. C. § 244 criminalizes conduct broader than Section 16(a)'s "use . . . of physical force." It is not because the Court views throwing hydrochloric acid on another person, as Ramirez-Gonzalez did, lightly.

Moreover, an immigration judge would have been able to consider the 2008 domestic violence arrest. In *Paredes-Urrestarazu v. U.S. INS*, the Ninth Circuit held that the BIA could consider an alien's narcotics arrest as a factor in adjudicating a request for discretionary relief from deportation, even though the arrest never resulted in a conviction because the underlying charges were dismissed. 36 F.3d 801, 810 (9th Cir. 1994). "The fact of arrest, insofar as it bears upon whether an alien might have engaged in underlying conduct and insofar as facts probative of an alien's "bad character or undesirability as a permanent resident" arise from the arrest itself, plainly can have relevance." *Id.* The BIA cited *Paredes-Urrestarazu* in a precedential opinion holding that when an alien's conduct "results in his having had contact with the criminal justice system or being placed in criminal proceedings, the nature of those contacts and the stage to which those proceedings have progressed should be taken into account and weighed accordingly." *Matter of Thomas*, 21 I. & N. Dec. 20, 24 (BIA 1995). In *Arreguin de Rodriguez*, which Ramirez-Gonzalez cites, the BIA cautioned that it was "hesitant to give substantial weight to an arrest report, absent a conviction or corroborating evidence of the allegations contained therein." 21 I. & N. Dec. 38, 42 (BIA 1995). In *Arreguin de Rodriguez*, the applicant had admitted to no wrongdoing, and so the BIA gave the arrest report "little weight." *Id.*

In light of *Paredes-Urrestarazu* and the BIA cases, the Court finds that an immigration judge would have been able to consider Ramirez-Gonzalez's 2008 domestic violence arrest, but would have given it only little weight. Ramirez-Gonzalez's conduct resulted in him being placed in criminal proceedings, but the proceedings did not progress beyond the initial stages. As in *Arreguin de Rodriguez*, the charges were ultimately dismissed. *See* Minute Order, Nov. 3, 2008,

Pl.'s Ex. H, ECF 31-2. On the other hand, the allegations were severe: Ramirez-Gonzalez's wife alleged that he had cut her with broken glass, and the physical evidence showed that he had cut her so deeply that her leg "bone was showing." Incident/Arrest Report, Feb. 10, 2008, Pl.'s Ex. F at 4. While an uncorroborated arrest is given only little weight, that is not no weight.

The final negative equity is "other evidence of bad character or the undesirability of the applicant as a permanent resident." *Matter of Arguelles–Campos*, 22 I. & N. Dec. at 817. Ramirez-Gonzalez was convicted of violating Pen. C. § 244 because he committed a serious act of domestic abuse: throwing hydrochloric acid on his girlfriend, who was trying to leave him, and her sister. When the 2008 arrest—however little weight it is given—is considered along with the acid attack, Ramirez-Gonzalez's behavior shows bad character and undesirability as a permanent resident.

In terms of the positive equities, Ramirez-Gonzalez had resided in the United States for six or eight years. *See* Ramirez-Gonzalez Decl. ¶ 1; Warrant of Removal/Deportation, Def.'s Ex. K. However, he arrived as an adult and was not schooled in the United States. Probation Officer's Report, Pl.'s Ex. C at 4-5. He has shown no community ties other than his employment, but that employment was illegal because he did not have authorization to work in the United States. Neither close family ties nor humanitarian needs weighs in his favor, either. Ramirez-Gonzalez's mother, siblings, and one of his children lived in Mexico. *See* Record of Deportable/Inadmissible Alien, Feb. 13, 2007, Def.'s Ex. D; Probation Officer's Report, Pl.'s Ex. C at 5-6. While Ramirez-Gonzalez had a wife and two United States citizen children, whom he supported, he did not live with his wife or the children. *See* Ramirez-Gonzalez Decl. ¶ 12. As of 2008, the wife lived in the United States, as shown by the police report for the February 2008 domestic violence incident, but it is unclear whether either United States citizen child lived in the United States. *See* Incident/Arrest Report, Feb. 10, 2008, Pl.'s Ex. F.

As for *Raya-Vaca*, that case is dissimilar from Ramirez-Gonzalez's situation. Unlike in *Raya-Vaca*, humanitarian concerns would not have militated in favor of relief, given that Ramirez-Gonzalez's mother, siblings, and one child lived in Mexico, he did not live with his United States citizen children, and it is unclear whether those children lived in the United States. By contrast,

most of Raya-Vaca's family lived in the United States.  *See* 7711 F3.d at 1208.  Finally, even though the standard for pre-hearing voluntary departure is lower than that for post-hearing voluntary departure, showing plausibility still requires more than showing that it is "merely conceivable or possible, that an IJ would have granted the relief."  *Valdez-Novoa*, 780 F.3d at 914.

Given the positive and negative equities in this case, Ramirez-Gonzalez has not met his burden of showing plausibility rather than possibility.  *Id.* at 916-17.  Because it is not plausible that Ramirez-Gonzalez would have received pre-hearing voluntary departure in the November 2008 proceedings, the due process violation was not prejudicial and the third Section 1326(d) requirement is unsatisfied.

Ramirez-Gonzalez's motion to dismiss is DENIED.

**IT IS SO ORDERED.**

Dated: July 11, 2016

_____
BETH LABSON FREEMAN
United States District Judge